UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A&R REAL ESTATE, INC.,

                    Plaintiff,

        – against –

DORIAN NEW YORK LLC *and*
DORYA USA, LLC,

                    Defendants.

**OPINION & ORDER**

20-cv-6976 (ER)

R̲AMOS̲, D.J.:

        A&R Real Estate, Inc. ("A&R") brought this action against Dorian New York LLC, ("Dorian") and Dorya USA, LLC, ("Dorya"), collectively "Defendants," for unpaid rent under a lease on a commercial space located at 105 Madison Avenue in New York City (the "Premises").  Doc. 1-1 at ¶¶ 2, 6.  A&R alleges breach of contract and enforcement of guarantee claims and seeks a declaratory judgment.  Before the Court is A&R's motion for partial summary judgment with respect to Dorian's liability on the claim for breach of contract, and Dorya's liability on the claim of enforcement of guarantee.  A&R also seeks summary judgment against both Defendants with respect to declaratory relief.  Finally, A&R moves to dismiss the affirmative defenses and counterclaims raised by the Defendants.  Doc. 37.  For the reasons stated below, A&R's motions are GRANTED.

## I.    BACKGROUND[1]

### A.  Factual Background

        In September 2019, F. Doruk Yorgancioglu ("Yorgancioglu"), the sole owner of Dorian and co-owner and CEO of Dorya, began to look for a commercial space in New York that he planned to use as a Dorya showroom.  Yorgancioglu Tr. at 10:9–18; 158:20–

---

[1] The following facts are drawn from the parties' Rule 56.1 statements, Docs. 41, 46, 51, supporting exhibits, and pleadings, and are undisputed unless noted otherwise.

24.  Dorya is an "internationally recognized" manufacturer of high-end furniture.  Doc. 45 at 8.  In a deposition taken on May 14, 2021, Yorgancioglu testified that Dorian is an entity that was created for the sole purpose of becoming a tenant at the Premises. Yorgancioglu Tr. at 141:6–142:11.  Yorgancioglu had prior experience leasing five different spaces in the United States but none in New York City.[2]  *Id.* at 77:5–14.

At all times relevant to this case, Jonathan Scutari ("Scutari') acted as the property manager of the Premises, and Brett Rovner ("Rovner") acted as the real estate broker for the Premises.  Yorgancioglu was made aware of the Premises by one of his sales representatives, Cihan Guler ("Guler").  *Id.* at 12:23–13:20; Guler Tr. at 9:21–10:14. Rovner, Guler, and Yorgancioglu met at the Premises on November 4, 2019, for a walk-through.

Between November 4, 2019, and January 6, 2020, Defendants hired a lawyer to assist them in the negotiation and finalization of a lease (the "Lease").  Yorgancioglu Tr. at 12:2–22.  After a period of counseled negotiations, on January 6, 2020, the Lease was fully executed.  Doc. 38-1 (the Lease).  A&R, the owner of the Premises, agreed to lease Dorian the Premises ("a portion of the first floor and mezzanine" of the building) for ten years and four months.  Doc. 1-1 at ¶¶ 2, 6.  The Lease contemplates that Dorian would use the Premises as a showroom to display Dorya's furniture and to maintain general and administrative offices.  Doc. 38-2 at ¶ 42(A).  The Lease included a base rent that started at $480,000 per year (or $40,000 per month), rising annually until it reached $701,493.65 (or $58,457.80 per month).  Doc. 38-1 at 9.  The Lease provided that Dorian's obligation to pay rent "shall in no way be affected, impaired or excused … by reason of the conditions of which have been or are affected, either directly or indirectly, by war or other emergency."  *Id.* at 5.

---

[2] It is unclear whether these five spaces were connected to Yorgancioglu's role at Dorya.  Yorgancioglu Tr. at 77:5–14.

On December 30, 2019, Dorya also executed a "good guy guaranty" of the Lease (the "Guaranty"), guaranteeing Dorian's rent payments and the fulfillment of its Lease obligations.[3]  Doc. 38-4.  The Guaranty provides that Dorya "shall not be liable to [A&R] for any Rent or other charges under the Lease attributable to periods after the Vacate Date."  *Id.* at 2.  The Vacate Date is defined as

> [T]he date upon which all of the following conditions have occurred:  (a) [Dorian] … vacates the [] Premises and removes all of its property… (including any … alterations or installations…); (b) [Dorian] lawfully surrenders possession of the [] Premises …; (c) [Dorian] has delivered all keys to the [] Premises to [A&R]; and (d) [Dorian] has provided [A&R] with at least ninety (90) days' prior written notice of [Dorian's] intention to vacate the [] Premises.

*Id.*  If Dorian *failed* to provide prior written notice, the Vacate Date is "ninety (90) days after the conditions in clauses (a), (b) and (c) … have been satisfied."  *Id.*  The Guaranty concludes, "[f]or the avoidance of doubt, upon the full satisfaction of the conditions in clauses (a), (b), (c) and (d) …, [Dorya] shall have no liability … for any obligations of [Dorian] arising after the Vacate Date."  *Id.*  A&R concedes that Dorya's liability under the Guaranty is limited to the period prior to the Vacate Date if the Guaranty's conditions were satisfied.  Doc. 51 at 3 ¶ 11.

When the Lease was signed, the Premises contained an internal staircase connecting the mezzanine to the second floor.  Dorian did not agree to lease any portion of the second floor.  *Id.* at 1 ¶ 2.  Accordingly, A&R and Dorian signed a Rider Annexed to the Lease (executed simultaneously to the Lease) that specifies that A&R would be responsible for removing the staircase.  Doc. 38-2 at ¶ 43(A) (the "Lease Rider").  The Lease Rider provides that A&R would not "be required to … prepare the [] Premises for [Dorian's] occupancy *except* for 'Owner's Work.'"  *Id.* (emphasis added).  'Owner's Work' consists of the "[i]nstallation of a slab to close of[f] the mezzanine from the second floor."  Doc. 38-1 at 10.  The Lease Rider further provides that "[*e*]*xcept for the*

---

[3] A&R claims that the Guaranty is a valid contract, while Defendants state that assessing its validity "call[s] for a legal conclusion."  Doc. 46 ¶ 6.

*completion of Owner's Work*, [Dorian] shall accept possession of the [] Premises in 'as is' condition as of the date of this Lease."  Doc. 38-2 at ¶ 43(A) (emphasis added).  In other words, the Lease Rider does not require the Owner's Work to be completed before Dorian takes possession.  The Lease Rider does not list an explicit time period in which A&R was required to commence or complete the Owner's Work.  *Id.*  However, the Lease Rider does explicitly set forth a detailed timeframe for the completion and submission of plans and specifications for the "Tenant's Work," which is to be performed by Dorian.  *Id.* at ¶ 45 (setting forth thirty days after the date of the Lease for Dorian to deliver to A&R the plans and specifications for Tenant's Work, fifteen days for A&R to approve or object, and thirty days for Dorian to deliver revised plans and specifications for approval).  The Lease Rider does not set forth a specific timeframe for Dorian's application for permits or completion of the Tenant's Work, instead stating that Dorian should do so "promptly" after A&R approves of the final plans and specifications.  *Id.*

The Lease Rider provides that the "Commencement Date" would be either January 1, 2020, or whenever possession was tendered to Dorian, whichever came later.  *Id.* at ¶ 44(A).  On the Commencement Date, Dorian would be required to deliver to A&R a $260,000 security deposit.  *Id.* at ¶ 56(A).  On January 6, 2020, A&R executed the Lease, and Dorian paid A&R $40,000 for the first month's rent and $120,000 as the cash portion of the required security deposit.  Doc. 46 at 6 ¶ 24.

On January 9, 2020, Yorgancioglu sent an email to Rovner stating he was "going to send over one of our designers[4] to take possession of the space on Tuesday morning [January 14, 2020] at 9 AM."  Doc. 38-10 at 2.  Yorgancioglu testified that this "didn't end up happening" without further elaboration as to why.  Yorgancioglu Tr. at 70:2– 73:12.

---

[4] The person referred to as "designer" in this email was Guler.  Doc. 41 at 5 ¶ 30.

Shortly after January 11, 2020, Dorian sought and obtained approval—in accordance with the Lease Rider—to install a sign to be displayed in the front window of the Premises. *See* Doc. 46 at 7 ¶ 28; Doc. 38-2 at ¶ 60 (requiring Dorian to obtain consent from A&R before installing signs in the Premises for the duration of the Lease's ten-year term).

Dorian and A&R signed an amendment to the Lease Rider (the "Amendment") on January 17, 2020. Doc. 38-3. The Amendment revised ¶ 56(A) of the Lease Rider to allow the $140,000 balance of the required security deposit to be paid in cash or by a conforming letter of credit, at Dorian's option. Doc. 46 at 7 ¶ 26. The Amendment provided in relevant part: "On the Commencement Date, [Dorian] shall deliver to [A&R] a cash security deposit in the amount of $260,000." Doc. 38-3 at 2. Having already paid $120,000 as the first installment of the security deposit, Dorian paid the remaining balance ($140,000) to A&R pursuant to the Amendment's instructions on January 21, 2020. Doc. 46 at 7 ¶¶ 26–27. A&R claims Dorian substantially complied with the requirement on January 6, 2020, by paying the first installment and fully completed its Commencement Date obligations on January 21, 2020.[5] Doc. 49 at 9.

The parties dispute whether the Lease ever became effective. A&R alleges that it became effective on January 6, 2020, Doc. 46 at 11 ¶ 41, or at the latest January 21, 2020, when Dorian completed its $260,000 security deposit payments. Doc. 49 at 9. Defendants allege that the Lease never became effective, as the Owner's Work was never completed, and Defendants were never given a set of keys for the Premises. Doc. 45 at 8; Doc. 46 at 11 ¶ 42; Rovner Tr. at 82:8–91:10; Yorgancioglu Tr. at 40:22–42:15. However, A&R contends that a set of keys was left with the doorman of the building for Dorian to pick up. Doc. 51 at 10 ¶ 31. It is undisputed that when Dorian wanted access to the Premises between January and April 2020, Guler or Yorgancioglu contacted

---

[5] A&R asserts Dorian fulfilled its obligation to pay its security deposit by January 20, 2020. Doc. 49 at 9. However, the Court notes that the record shows this occurred on January 21, 2020. Doc. 46 at 7 ¶ 27.

Rovner, who then had the doorman give them the keys.  *See* Doc. 46 at 11 ¶ 43; Doc. 38-
17.  There is no allegation that A&R refused or denied Defendants from accessing the
Premises at any point after the execution of the Lease.  *See generally* Doc. 45.

      Also in January 2020, Scutari, A&R's property manager, and Sarkis Arakelyan of
Millenium Contracting Co. ("Millenium") discussed the Owner's Work with Dorian.
Doc. 46 at 8–9 ¶¶ 32–34.  On January 30, 2020, Millenium provided a written proposal to
install a temporary wall blocking the stairs between the mezzanine and the second floor
of the Premises and subsequently remove those stairs, which was accepted by A&R.  *Id.*;
*see also* Doc. 38-12 at 2 ("Millenium Proposal").  Scutari asked Millenium to complete
the required drawings and other paperwork needed to obtain approval from the
Department of Buildings for the removal of the stairs as soon as possible.  Doc. 46 at 9
¶ 36.  At a deposition taken on June 18, 2021, Scutari testified that a temporary wall
blocking the staircase could have been erected in one or two days.[6]  Scutari Tr. at 83:20–
84:11.

      In late January 2020, Yorgancioglu sent an email to Elliot Blanchard, an attorney
for A&R, to alert him that the Owner's Work was not being done, stating "[w]e cannot
apply for a permit or do any work until the third-floor partition permit."  Doc. 51 at 4 ¶¶
13–14.  Dorian claims that it could not secure or renovate the Premises or install fixtures
until the Owner's Work was completed.  A&R disputes this.  *Id.* at 4–5 ¶¶ 15–16; *id.* at 10
¶ 32.

      Prior to February 3, 2020, Victor Famulari ("Famulari"), an architect who did
work for Yorgancioglu's companies, sent Yorgancioglu a proposal.  Yorgancioglu Tr. at
94:13–100:11.  On February 3, 2020, Yorgancioglu responded to Famulari, thanking him
for his proposal and telling Famulari that he wanted to start work at the Premises.  Doc.

---

[6] Scutari also claimed that the temporary installation would not have required a permit from the Department
of Buildings, Scutari Tr. at 83:20–23, while Defendants allege that whether filings or approvals were
required is a matter of law.  Doc. 46 at 10 ¶ 37.

38-16 at 2.  Yorgancioglu paid Famulari $3,500 "to get the project going."  Yorgancioglu
Tr. at 99:15–22.

On March 1, 2020, New York State Governor Andrew Cuomo confirmed the first
case of the coronavirus (COVID-19) was discovered in New York.  On March 7, 2020,
Governor Cuomo issued Executive Order 202 imposing restrictions related to COVID-
19, which, among other things, required non-essential businesses to close in New York.
On March 11, 2020, the World Health Organization declared COVID-19 to be a global
pandemic.[7]

On April 30, 2020, Dorian caused its attorney to send a letter (the "April 30
Letter") to A&R, informing A&R:  "Because of the COVID-19 Pandemic, [Dorian] is
unable to proceed with the Lease and is surrendering possession in the event [Dorian]
ever, in fact, had legal possession of the subject space."  Doc. 38-18 at 2.  The April 30
Letter explicitly states that

> [I]n an abundance of caution, Dorya is herby providing written notice …,
> that the time period for the "Vacate Date" … should commence … today in
> light of the fact that:  a) [Dorian] never moved anything into the space nor
> made any alterations …, b) [Dorian] has lawfully surrendered …
> possession…, c) [Dorian] only temporarily used the keys for a few visits
> and then were returned, and d) this letter shall serve as [Dorian's] 90 day
> advance written notice as required.

*Id.* at 2–3.  According to Defendants, this triggered the ninety-day provision in the
Guaranty, which made the Vacate Date July 29, 2020, at the latest.  Doc. 45 at 23.  A&R
alleges that the Vacate Date was later because Dorya had not removed its sign from the
window of the Premises by April 30, 2020 (the date of Dorian's 90-day notice letter),
pursuant to the Guaranty's requirement that all "alterations or installations … be
removed" prior to the Vacate Date.  Doc. 38-4 at 2; Doc. 51 at 3–4 ¶¶ 10, 12.  On May

---

[7] *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*,
WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-
general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

28, 2020, Dorian arranged to remove the sign and after this, Defendants made no further use of the Premises.  Doc. 39 at ¶ 10; Guler Tr. at 47:3–49:18.

Between signing the Lease on January 6, 2020, and the April 30 Letter, Defendants and their representatives visited the Premises on at least two occasions.  On January 11, 2020, Defendants' employees installed a sign to be displayed in the front window of the Premises.  Yorgancioglu Tr. at 30:8–13, 33:7–10.  On January 14, 2020, Yorgancioglu was planning to send someone to the Premises to "take possession," but there is no confirmation of that meeting having occurred.  Doc. 38-10 at 2; Yorgancioglu Tr. at 70:2–73:12.  On March 5, 2020, Yorgancioglu and Guler picked up the keys from the doorman and conducted a walk-through of the Premises with Famulari.  Doc. 38-16 at 3; Doc. 38-17 at 2.

Given that the internal staircase was never removed, the parties dispute whether the Premises were sufficiently secure for Dorian to use the Premises.  A&R alleges that the second floor was unoccupied, locked, and inaccessible by anyone other than A&R or Dorian.  Doc. 49 at 7.  Dorian argues that "access from the second floor was never limited in any way."  Doc. 45 at 13; Doc. 46 at 16 ¶ 29.

The parties also dispute whether work with respect to the internal staircase was suspended.  A&R alleges it began the Owner's Work when it accepted Millenium's proposal on January 30, 2020.  Doc. 46 at 9 ¶ 34.  Thereafter, A&R says it received no contact from Dorian requesting information or explanations related to the status of the Owner's Work.  Doc. 51 at 9–10 ¶ 30.  A&R says it paused the Owner's Work when it received the April 30 Letter.  Doc. 39 at ¶ 16.  Defendants claim A&R never began the Owner's Work because it "did nothing to seal the space at any time" until it filed a permit with the Department of Buildings in July 2020.  Scutari Tr. at 62:3–24; Doc. 45 at 8, 13, 27.  Thus, Defendants conclude, there was nothing to suspend when the April 30 Letter was sent.  Doc. 45 at 13.

On June 8, 2020, New York City allowed retail stores to offer curbside pickup. By June 22, 2020, retail stores were once again allowed to have customers shop indoors.

It is undisputed that the application regarding the removal of the staircase was finalized on June 23, 2020, filed on July 16, 2020, and approved on July 30, 2020, by the Department of Buildings. *See* Doc. 38-14 at 2–3 (June 23, 2020, email exchange between Scutari and Joseph Lowinger with the signed Department of Buildings application attached); *see also* Doc. 38-15 at 2 (Department of Buildings permit, indicating the application was filed on July 16, 2020, and approved on July 30, 2020).

Defendants claim A&R mitigated any damages resulting from the breach in August 2021, by reletting the Premises to another tenant for a ten-year term. Doc. 45 at 30.

### B.  Procedural History

On July 13, 2020, A&R filed the instant complaint in the Supreme Court of the State of New York, County of New York, asserting one claim for breach of contract, one claim for enforcement of guarantee, and a claim for declaratory judgment. Doc. 1-1 at ¶¶ 15–44. On August 27, 2020, Defendants removed the action to this Court. Doc. 1.

On December 11, 2020, A&R submitted a letter motion to stay discovery and permit it to move for summary judgment. Doc. 13. After a conference, the Court denied A&R's motion to stay discovery. Doc. 47 at 19:6–22:2 (transcript of teleconference held on December 17, 2020).

On September 9, 2021, this case was referred to Magistrate Judge Sarah Cave for a settlement conference, which proved unsuccessful. Doc. 23.

On October 14, 2022, A&R responded to a request for a status report, Doc. 31, confirming that discovery had been completed. Doc. 32. On January 16, 2023, A&R moved for partial summary judgment. Doc. 37.

## II.     LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

III.   **DISCUSSION**

Before the Court is A&R's motion for partial summary judgment with respect to Dorian's liability for breach of contract, and Dorya's liability pursuant to the Guaranty. A&R also seeks summary judgment against both Defendants with respect to declaratory relief.  Finally, A&R moves to dismiss the affirmative defenses and counterclaims raised by the Defendants.  Doc. 37.

**A.  Breach of Contract**

A&R argues its breach of contract claim boils down to a simple argument that Dorian signed the Lease and accepted possession on January 6, 2020, began paying rent, and then repudiated the Lease on April 30, 2020.  Doc. 40 at 11–16.  A&R argues that since Dorian breached the contract, A&R is owed damages resulting from the breach.  *Id.* at 14.  However, Dorian argues that the Lease never commenced in the first instance because either the incorrect Premises were tendered to Dorian or, alternatively, the Premises were never delivered to Dorian at all.  Doc. 45 at 15–24.

As a preliminary matter, the Court finds that the Lease is unambiguous in that it mandates "a portion of the ground floor and a portion of the mezzanine" to be leased to Dorian by A&R.  Doc. 38-1 at 2.  As the Lease is unambiguous, and there is no question of material fact present, summary judgment is appropriate.  *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994).  In reading the contract, the Court must "examine the entire [Lease]" and consider words "in the light of the obligation as a whole and the intention of the parties manifested thereby."  *Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998) (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)).

*1.  A&R tendered the correct Premises as defined in the Lease.*

The Lease required A&R to deliver "a portion of the ground floor and a portion of the mezzanine" to Dorian.  Doc. 38-1 at 2.  Pointing to this language, Dorian contends that the space A&R tendered was different than the space Dorian contracted to rent in the

11

Lease because an internal staircase existed connecting the mezzanine to the second floor. Doc. 45 at 15–16. Dorian argues that because it never agreed to lease any portion of the second floor, Doc. 51 at 1 ¶ 2, A&R could not possibly have tendered the correct space due to the internal staircase. Doc. 45 at 15–16. Finally, Dorian claims that "access from the second floor was never limited in any way." Doc. 45 at 13; *see also* Doc. 46 at 16 ¶ 29. In turn, A&R asserts that "no part of the second floor was ever tendered" to Dorian. Doc. 49 at 7. Instead, A&R alleges that it provided Dorian with the precise space it was required to provide by the Lease ("a portion of the ground floor and a portion of the mezzanine"). The mezzanine was temporarily connected—via the internal staircase—to the second floor, until the Owner's Work was completed to remove the staircase. *Id.* at 7. In the interim, A&R claims that the second floor was not leased to any tenant so that it was only accessible by A&R or Dorian. *Id.* at 7; *see also* Doc. 50 at ¶¶ 6–7. The Court finds that the Premises was tendered to Dorian in accordance with the Lease.

Prior to signing the Lease, Dorian's representatives[8] conducted a walk-through of the Premises. Doc. 46 at 6 ¶ 21. Although there was an internal staircase present connecting the mezzanine to the second floor, Dorian had not rented any portion of the second floor. Doc. 51 at 1 ¶ 2. So, during the course of counseled negotiations, Yorgancioglu Tr. at 12:2–22, the parties included a provision in the Lease Rider requiring A&R to close off the internal staircase. Doc. 38-2 at ¶ 43(A). Moreover, even with full knowledge of the staircase's existence, Dorian agreed to accept possession of the premises "as is." *Id.* A&R then secured the Premises by locking the second floor so it was inaccessible to any other tenants.[9] Doc. 49 at 7. Additionally, the Lease Rider specifies that the Commencement Date would be when A&R tendered possession of the

[8] Guler and Yorgancioglu were acting as Dorian's representatives when they conducted a walk-through of the Premises with Rovner on November 4, 2019.

[9] Although Defendants argue that "access from the second floor was never limited in any way," the Court finds no support for that assertion in the record, including in the testimony cited to by Defendants. *See* Doc. 45 at 13 (citing Yorgancioglu Tr. at 46:24–49:17, 64:7–23).

Premises to Dorian.  Doc. 38-2 at ¶ 44(A).  The Amendment signed on January 17, 2020, clearly states that on the Commencement Date, Dorian would deliver $260,000 to A&R.  Doc. 38-3 at 2.  Between January 6 and 21, 2020, Dorian paid A&R $260,000 in two installments—an event required of it once A&R tendered possession of the Premises.  *Id.*; *see also* Doc. 38-2 at ¶ 44(A).  Thus, when Dorian paid A&R its security deposit, Dorian established the Commencement Date (or the date on which possession was tendered) before the Owner's Work was completed.  *Cf. Glover v. Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 448 (S.D.N.Y. 2022) (applying the principle of ratification to a contract's terms).  So, on January 21, 2020, Dorian took possession without objection.  Had the Lease not yet commenced at that moment because A&R delivered the incorrect Premises to Dorian, these provisions in the Lease would be pointless.  *Batales v. Friedman*, 41 N.Y.S.3d 275, 277 (App. Div. 2016) ("[A]n interpretation which renders language in the contract superfluous cannot be supported.").  This result would also be "contrary to the reasonable expectations of the parties" who expected the Lease to commence when the Lease said it commenced.  *Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 2003).  Thus, rather than redrafting the provisions of the Lease, the Court must enforce the terms of this clear and complete agreement made by two "sophisticated, counseled business people negotiating at arm's length."  *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995); *Tiki Boatworks, LLC v. Crusin' Tikis, LLC*, No. 20 Civ. 907 (TJM) (DJS), 2021 WL 1198256, at *3 (N.D.N.Y. Mar. 30, 2021) (finding a party "sophisticated" when it established an entity to limit its legal liability).  Thus, the Court finds A&R tendered possession of the correct Premises as required of it by the terms of the Lease.

     *2.   A&R was not required to complete the Owner's Work as a condition precedent to Dorian's acceptance of possession of the Premises.*

The Lease Rider states, "[e]xcept for the completion of Owner's Work, [Dorian] *shall* accept possession of the Premises in 'as is' condition…."  Doc. 38-2 at ¶ 43(A)

(emphasis added).  The Owner's Work was to consist of the "[i]nstallation of a slab to close of[f] the mezzanine from the second floor."  Doc. 38-1 at 10.  It is clear that this provision contained no timetable for the commencement or completion of the Owner's Work, nor does it require that the Owner's Work be completed before Dorian can take possession.  *Id.*  Meanwhile, the Lease Rider sets forth a detailed framework with respect to the timeline of any of Dorian's contemplated improvements to the Premises ("Tenant's Work").  Doc. 38-2 at ¶ 45.

Additionally, the Lease Rider lists the Commencement Date as the day possession is tendered to Dorian.  *Id.* at ¶¶ 44(A)–(B).  On which date, Dorian would deliver to A&R a security deposit totaling $260,000.  Doc. 38-3 at 2.  After executing the Lease, Dorian paid $120,000 and $140,000—representing its security deposit—on January 6 and 21, 2020, respectively.  Doc. 46 at 6–7 ¶¶ 24, 26–27.  On January 9, 2020, Yorgancioglu sent an email to Rovner stating he was "going to … take possession of the space on Tuesday morning [January 14, 2020] at 9 AM."  Doc. 38-10 at 2.  Though, Yorgancioglu testified that this "didn't end up happening" without explaining why.  Yorgancioglu Tr. at 70:15–73:5.

Dorian argues ¶ 43(A) of the Lease Rider operates as an express provision conditioning its acceptance of possession of the Premises upon the completion of the Owner's Work.  Doc. 38-2 at ¶ 43(A); Doc. 45 at 17.  Thus, Dorian argues, since A&R never completed the Owner's Work, it never tendered possession of the Premises to Dorian.  Doc. 45 at 17–21.  Dorian claims any alternative interpretation would allow A&R to put off its obligation to complete the Owner's Work for years, making it impossible for Dorian to renovate—and therefore use—the Premises, while A&R continued to charge rent for the space.  *Id.* at 20.  In response, A&R claims that ¶ 43(A) of the Lease Rider served to define the "scope of the work that [A&R] agreed to perform with respect to the Premises" and clarified that Dorian's acceptance of possession of the Premises "as is" did not negate A&R's obligation to complete the Owner's Work at some

14

point thereafter.  Doc. 49 at 7.  Additionally, A&R points to the lack of any language in the Lease Rider establishing a timeframe for the completion of the Owner's Work or order of priority between the Owner's Work and Dorian's acceptance of possession as evidence that it was not a condition precedent to the acceptance of possession.  Doc. 40 at 12–13.  The Court finds that ¶ 43(A) of the Lease Rider was not a condition precedent to Dorian's possession.

A&R and Dorian could have signed a Lease with an express provision abating rent or the payment of the security deposit until the completion of the Owner's Work. *Fox Paper Ltd. v. Schwarzman*, 563 N.Y.S.2d 439, 440 (App. Div. 1990) (conditioning the commencement of a lease upon the completion of the landlord's construction work); *see also Pac. Coast Silks, LLC v. 247 Realty, LLC*, 904 N.Y.S.2d 407, 409–10 (App. Div. 2010) (altering a lease's commencement date if the landlord's elevator repairs were delayed).  The parties incorporated similar provisions laying out explicit timetables related to the construction and completion of the Tenant's Work.  Doc. 38-2 at ¶ 45. However, Dorian opted instead to agree to begin rent payments immediately upon execution of the Lease notwithstanding the provision requiring A&R to complete the Owner's Work.  *Id.* at ¶¶ 43–44.  Having signed the Lease and seen that the Owner's Work was not yet completed, Dorian paid A&R the balance of its security deposit as required when possession had been delivered.  *Id.* at ¶ 44(A);  *see also* Doc. 38-3 at 2. On January 21, 2020, Dorian did not take the position that the Lease had not yet commenced due to a failure to complete the Owner's Work before then.  *Pac. Coast Silks*, 904 N.Y.S.2d at 413 (finding a commercial tenant's acceptance of a key notwithstanding his knowledge of landlord's delay in repairing the elevator to be evidence against his claim that possession had not yet been delivered).

Dorian argues that adopting A&R's proposed interpretation of the contract would allow A&R to delay the completion of the Owner's Work for years or even fail to ever complete it.  Doc. 45 at 20.  However, implied in A&R's contractual obligation to

perform the Owner's Work is a duty to perform the work within a reasonable time after the start of the Lease. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("Where a contract does not specify a date or time for performance, New York law implies a reasonable time period."). This is especially the case if A&R's failure to do so would deprive Dorian of a substantial part of the Lease's term. *Cf. Rein v. Robert Metrik Co.*, 105 N.Y.S.2d 160, 162 (Sup. Ct. 1951) (finding a landlord in breach of his lease by depriving a tenant of occupancy for a sixth of his lease's term). These implicit protections are in place to protect Dorian against the possibility that A&R would unreasonably delay its performance. Thus, although Dorian urges the Court that adopting A&R's interpretation of the contract would yield an absurd result (A&R being able to cash checks for ten years without ever completing the Owner's Work), this concern is addressed by the protections afforded to Dorian under New York contract law. *Guilbert*, 480 F.3d at 149; *see also Schmidt v. McKay*, 555 F.2d 30, 35 (2d Cir. 1977).

   *3. A&R provided Dorian with keys to the Premises.*

   A&R never physically handed the keys to the Premises to Dorian after the Lease was executed. *See generally* Doc. 46 at 11–12 ¶¶ 41–44. However, it is undisputed that a set of keys was left by A&R with the doorman, and that when Dorian wanted access to the Premises between January and April 2020, representatives (Guler or Yorgancioglu) would contact Rovner, who had the doorman provide the keys. *See* Doc. 38-17; *see also* Doc. 46 at 11 ¶ 43. Finally, there is no allegation that A&R refused or denied Defendants from accessing the Premises at any point after executing the Lease. *See generally* Doc. 45.

   Dorian claims that A&R's failure to physically hand over a set of keys was tantamount to a failure by A&R to deliver possession of the Premises. *Id.* at 12. Dorian argues that A&R never told Dorian it could have copies of the keys made and required it to contact Rovner when it wanted access to the Premises. *Id.* at 10. A&R counters that it left a set of keys with the building's doorman for Dorian to pick up on January 6, 2020,

when the parties executed the Lease.  Doc. 51 at 10 ¶ 31.  Once Dorian had access to the keys, A&R contends that Dorian could do with them whatever it pleased.  Doc. 49 at 10.  A&R points to Defendants' lack of communication regarding the keys as evidence that this argument is merely a post-hoc rationalization for repudiating the Lease.  *Id.* at 6.  Dorian has not alleged that it was denied—or even asked for—a separate set of keys, to make copies of the keys, or to take the keys with it upon departing the Premises.  *Id.* at 10.  The Court finds that A&R effectively provided Dorian with keys to the Premises.

Keys have long been "the symbol of possession" such that "furnishing[10] a tenant with a key to leased premises is a customary incident to the giving of possession...."  *Am. Tract Soc'y v. Jones*, 134 N.Y.S. 611, 613 (App. Term 1912).  Where the landlord arbitrarily refuses to provide a tenant with keys to the leased premises, the landlord has constructively evicted the tenant.  *Id.* at 614 (finding a landlord in breach of the covenant of quiet enjoyment for failing to provide a tenant with keys to the leased premises' only door even after the tenant asked for a key, requested to make a copy, and offered to pay for that copy).  *But see 41st RKC Trib. Assocs. v. Small Comput. Co., Inc.*, 495 N.Y.S.2d 640, 641 (Civ. Ct. 1985) (finding no breach of the covenant of quiet enjoyment by a landlord who refused to give a tenant a key to gain entry during nonbusiness hours— requiring him to await the response of the doorman instead).  A&R did not refuse to supply Dorian with keys to the Premises or prevent Dorian from accessing the Premises in any way.  *Cf. Am. Tract Soc'y*, 134 N.Y.S. at 614.  On the contrary, when the Lease was signed, the keys to the Premises were provided to Dorian anytime access was requested.  Doc. 46 at 11–12 ¶¶ 43–44.  In this regard, it bears noting that Defendants were not strangers to renting commercial spaces.  Doc. 45 at 8 (stating that Dorya has showrooms all around the world); Yorgancioglu Tr. at 77:5–10 (Yorgancioglu had previously leased

---

[10] Both *Webster's* and the *Oxford English Dictionary* define 'furnish' as to "provide" or "supply" somebody with something.  MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/furnish (last visited Sept. 5, 2023); OXFORD ENG. DICTIONARY, https://www.oed.com/dictionary/furnish_v?tab=meaning_and_use#3322241 (last visited Sept. 5, 2023).

five different spaces in the United States).  Thus, although Dorian was perfectly positioned to know whether it needed its own set of keys, Dorian took no action to remedy this and made no request of A&R prior to its repudiation.  Doc. 49 at 6.

Thus, even construing the facts in the light most favorable to Dorian, Dorian was not deprived of possession of the Premises by virtue of A&R's failure to physically hand over the keys when Dorian had complete dominion over them—and therefore the Premises—whenever it desired.  Doc. 46 at 11 ¶ 43.

**B. Enforcement of Guarantee**

On the same day the Lease was signed, Dorya executed the Guaranty providing that it would be liable for Dorian's rent payments and the fulfillment of its Lease obligations.  Doc. 38-4 at 2.[11]  The Guaranty limited Dorya's liability to any period prior to the Vacate Date.  *Id.* at 2.  The Vacate Date is ninety days after Dorian provides A&R with written notice[12] of an intent to vacate the Premises.  *Id.*  Between providing notice and the Vacate Date, Dorian must also have:  (a) vacated the Premises and removed all of its property ("including any other alterations or installations"); (b) surrendered possession of the Premises; and (c) delivered all keys to A&R.  *Id.*  Dorian sent the April 30 Letter informing A&R of its intent to vacate the Premises and that it had surrendered possession and all keys to the Premises.  Doc. 38-18 at 2–3.  Shortly thereafter, on May 28, 2020, Dorian arranged to remove the sign it had previously installed in the front window of the Premises.  Doc. 39 at ¶ 10; Guler Tr. at 47:3–49:18.  A&R concedes that Dorya's liability under the Guaranty is limited if the conditions set forth therein were met.  Doc. 51 at 3–4 ¶ 11.

First, the Court must address Dorya's claim that the April 30 Letter raises questions of fact as to the enforceability of the Guaranty that are inappropriate for the

---

[11] A&R claims the Guaranty is a valid contract, while Defendants state such a claim "call[s] for a legal conclusion."  Doc. 46 at 3 ¶ 6.

[12] If *no written notice* is provided, the Vacate Date is "ninety [90] days after the conditions in clauses (a), (b) and (c) have been satisfied."  Doc. 38-4 at 2 (emphasis added).

Court to resolve at this stage.  Doc. 45 at 23.  It is not clear to the Court from Defendants'
briefs what those questions of fact could be.  Instead, the Court views the issue of
whether the Guaranty imposes binding obligations on Dorya as one "call[ing] for a legal
conclusion," precisely as Defendants stated in their counterstatement of material
undisputed facts.  Doc. 46 at 3 ¶ 6.  Thus, as this Guaranty is an unambiguous contract
with no questions of material fact present, summary judgment is appropriate.  *Mellon
Bank,* 31 F.3d at 115; *see also Gen. Phoenix Corp. v. Cabot*, 89 N.E.2d 238, 241 (N.Y.
1949) ("[N]o trial is necessary to determine the legal effect of [a] contract.").

    Substantively, the parties advance several arguments related to Dorya's liability
under the Guaranty.  Doc. 45 at 23; Doc. 49 at 10–11.  A&R argues that because the sign
was still in place on May 1, 2020, the April 30 Letter could not start the ninety-day clock
establishing the Vacate Date.  Doc. 49 at 11.  The sign, A&R argues, was an alteration or
installation that was required to be removed by the Guaranty prior to the Vacate Date.
Doc. 38-4 at 2; Doc. 38-2 at ¶ 60(A).  Dorya counters that the April 30 Letter triggered
the ninety-day provision in the Guaranty, which makes the Vacate Date July 29, 2020, at
the latest.  Doc. 45 at 12, 23.  Dorya points out that the sign need not be removed prior to
the written ninety-day notice but only prior to the Vacate Date.  Doc. 38-4 at 2.  Thus,
Dorya concludes, having triggered the ninety-day provision by sending the April 30
Letter and complying with the three provisions of the Guaranty within the subsequent
ninety days, the Vacate Date should be July 29, 2020, at which date Dorya's liability as
guarantor ended.  Doc. 45 at 23.

    While A&R is correct that the sign was an installation under the Lease's terms,
Doc. 38-2 at ¶ 60, Dorya is correct that the April 30 Letter triggered the ninety-day
provision, making the Vacate Date July 29, 2020.  Doc. 38-4 at 2.  The April 30 Letter
explicitly states that it would "serve as [Dorian's] 90 day advance written notice as
required."  Doc. 38-18 at 3.  Thus, when the April 30 Letter was received, notice was
provided and conditions (b) and (c) were already satisfied.  Doc. 38-4 at 2.  So long as

Dorian removed its sign from the window prior to the Vacate Date (which it did) all
conditions would be met on July 29, 2020 (which they were). *Id.* Thus, the Vacate Date
is July 29, 2020, after which date, Dorya's obligations under the Guaranty ceased. *Id.*

Finally, A&R claims that Dorya's argument regarding the Vacate Date relates to
damages rather than liability, making it "academic" on this motion. Doc. 49 at 11;
*Delshah 60 Ninth, LLC v. Free People of PA, LLC*, No. 20-civ-5905, 2022 WL 4228213,
at *20 (S.D.N.Y. June 29, 2022). The Court disagrees. Although Dorya's argument
regarding the effect of the April 30 Letter will have the incidental effect of limiting
damages, the argument is primarily geared towards establishing the legal effect of the
April 30 Letter, which is appropriate to decide on a motion for summary judgment. *See
Gen. Phoenix*, 89 N.E.2d at 241 ("[N]o trial is necessary to determine the legal effect of
[a] contract.").

Thus, A&R's motion with respect to enforcing the Guaranty is granted for the
period prior to the Vacate Date—July 29, 2020.

### C. Defendants' Affirmative Defenses

A&R's motion for partial summary judgment also asks the Court to dismiss all
affirmative defenses and counterclaims by the Defendants. In their answer to A&R's
complaint, Defendants raise nine affirmative defenses. Doc. 9 at 6–7. For the reasons set
forth below, A&R's motion for summary judgment is granted with respect to Defendants'
affirmative defenses 1–7 and 9. Defendants' eighth affirmative defense is moot due to the
Court's denial of Defendants' counterclaims as explained in greater detail below.

Defendants' first two affirmative defenses are: (1) failure to state a claim and (2)
waiver, estoppel, and/or laches. *Id.* at 6. A&R asserts that these defenses are false,
irrelevant, or lacking evidence. Doc. 40 at 23. In any event, Defendants abandoned these
affirmative defenses by failing to raise them in its opposition brief. Doc. 49 at 11; *see
generally* Doc. 45.

Defendants' third affirmative defense is that A&R's claims are barred by its own unclean hands. Doc. 9 at 6; Doc. 45 at 29–30. Although the doctrine of unclean hands is an equitable doctrine, it is available in an action that is not "exclusively for damages." *Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc.*, 806 N.Y.S.2d 480, 482 (App. Div. 2005). Defendants argue that A&R's claim for declaratory judgment allows them to raise this defense. Doc. 45 at 29–30. Declaratory judgment actions are neither inherently legal nor equitable in nature but rather take on the characteristics of the underlying suit. *Simler v. Conner*, 372 U.S. 221, 223 (1963). Here, the underlying suits are claims for breach of contract and enforcement of guarantee—neither of which raise equitable principles. *Rosenman v. Richard*, 850 F.2d 57, 60–61 (2d Cir. 1988) (stating that contractual liability is traditionally a legal issue). Thus, the doctrine of unclean hands is inapplicable. Even if the doctrine applied here, Defendants have not pointed to any "immoral or unconscionable" conduct by A&R as is required to assert this defense. *Frymer v. Bell*, 472 N.Y.S.2d 622, 625 (App. Div. 1984).

Defendants' fourth affirmative defense is that A&R's claims are barred by its own material breach of the Lease because A&R failed to deliver a set of keys to Dorian or take any steps to complete the Owner's Work. Doc. 45 at 29; Doc. 9 at 6. For reasons previously mentioned, A&R did not breach the Lease by failing to deliver the keys to Dorian. Also, as previously explained, the Lease imposed no timetable for A&R's completion of the Owner's Work and required Dorian to take possession of the Premises "as is." Thus, A&R did not materially breach the Lease by failing to complete the work in the first four months of a ten-year lease. Moreover, even if A&R did breach the Lease, Dorian would still be obligated to continue to pay rent because there was no express provision in the Lease relieving Dorian of its obligation to pay rent in the event A&R breached. *Universal Commc'ns Network, Inc. v. 229 W. 28th Owner, LLC*, 926 N.Y.S.2d 479, 480 (App. Div. 2011) ("[T]he obligation to pay rent pursuant to a commercial lease

is an independent covenant, and thus, cannot be relieved by allegations of a landlord's breach, absent an express provision to the contrary.").

Defendants' fifth and sixth affirmative defenses are that A&R's claims are barred because (5) A&R did not suffer any cognizable monetary loss and (6) failed to mitigate damages.  Doc. 9 at 7; Doc. 45 at 30.  A&R contends that its loss is the deprivation of the contract's benefits that resulted from Dorian's repudiation.  Doc. 40 at 23–24.  Additionally, commercial landlords have no duty to mitigate damages in New York. *Mitchell & Titus Assocs., Inc. v. Mesh Realty Corp.*, 554 N.Y.S.2d 136, 137 (App. Div. 1990).  Defendants concede this point—only pointing out that A&R in fact mitigated damages by reletting the space in August 2021.  Doc. 45 at 30.  This argument exclusively relates to Defendants' possible damages (not its legal liability), rendering it futile to investigate further at this stage. *Delshah*, 2022 WL 4228213 at *20.

Defendants' seventh affirmative defense is that A&R may not recover by virtue of the doctrines of impossibility, impracticability and/or frustration of purpose.  Doc. 9 at 7; Doc. 45 at 24–28.  The Court's reasoning for dismissing this affirmative defense is set forth in greater detail below regarding Defendants' counterclaims.

Defendants' eighth affirmative defense is that Defendants are entitled to offset their potential liability by damages A&R owes Defendants by virtue of their Counterclaims.  Doc. 9 at 7.  This defense relates only to damages, which is not at issue on this motion for partial summary judgment. *Delshah*, 2022 WL 4228213, at *20.  In any event, this affirmative defense is moot because, as set forth below, the Court has dismissed all of Defendants' counterclaims.

Defendants' ninth affirmative defense is that it reserves the right to raise additional affirmative defenses.  Doc. 9 at 7.  No additional affirmative defenses have been raised.

### D. Defendants' Counterclaims

*1. Rescission Based on Frustration of Purpose*

The frustration of purpose doctrine is "very narrow." *Baker v. 16 Sutton Place Apartment Corp.*, 973 N.Y.S.2d 63, 64 (App. Div. 2013) (internal quotations omitted). It only applies if the frustration is "substantial." *Rockland Dev. Assocs. v. Richlou Auto Body, Inc.*, 570 N.Y.S.2d 343, 344 (App. Div. 1991). This doctrine has historically been limited to scenarios "where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party." *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974).

*a. The COVID-19 Pandemic and Relevant Government Orders*

The Lease, which was fully executed on January 6, 2020, contemplates that Dorian would use the Premises to create a showroom to display Dorya's furniture and as offices. Doc. 38-2 at ¶ 42(A). The Lease stated that Dorian's obligation to pay rent "shall in no way be affected, impaired or excused … by reason of the conditions of which have been or are affected, either directly or indirectly, by … emergency." Doc. 38-1 at 5. Several months later, the COVID-19 pandemic reached New York City. On March 7, 2020, Governor Cuomo issued Executive Order 202, which required all non-essential businesses in New York to close. Doc. 51 at 6 ¶ 20. The World Health Organization declared COVID-19 to be a global pandemic on March 11, 2020. On June 8, 2020, New York City allowed retail stores to offer curbside pickup. By June 22, 2020, retail stores were once again allowed to have customers shop indoors.

Defendants argue that the COVID-19 pandemic and subsequent government orders prevented Dorian's occupancy of the Premises, which raises the factual inquiry of whether this disruption rises to the level of frustration of purpose. Doc. 45 at 25. Defendants claim that the doctrine should apply because COVID-19 (and Governor Cuomo's Executive Orders in response thereto) constituted an unforeseen event that destroyed the underlying purpose of the Lease and the Guaranty. Doc. 9 at 11–12.

Defendants contend that Dorian was completely unable to operate its business due to the government shutdown, which was outside of its control.  *Id.* at 12.  Defendants also argue that Dorian's business could not have been conducted using "curbside service" and that no limited opening would satisfy the Lease's purpose.  Doc. 45 at 25.  Thus, Defendants seek a declaration extinguishing Dorian's obligations under the Lease and Dorya's obligations under the Guaranty.  Doc. 9 at 12.

A&R argues that Defendants' argument fails because the parties expressly contemplated "governmental responses to emergencies" in the Lease.  Doc. 49 at 11.  So, although the parties may not have predicted the COVID-19 pandemic, the parties considered the possibility that government action could hinder Dorian's use of the premises.  Doc. 40 at 17.  Additionally, A&R argues that Dorian was not "completely deprived of the benefit of its bargain" because Dorian could have made use of the Premises to display Dorya's furniture or maintain offices notwithstanding the pandemic. *Gap, Inc. v. 170 Broadway Retail Owner, LLC*, 151 N.Y.S.3d 37, 40 (App. Div. 2021) (internal quotations omitted).

The Court finds that the Lease is enforceable notwithstanding the pandemic and related government orders.  In the period following the pandemic, New York courts have rejected countless frustration of purpose defenses by commercial tenants claiming the COVID-19 pandemic excused them from paying rent.  *See e.g.*, *id.*; *NTS W. USA Corp. v. 605 Fifth Prop. Owner, LLC*, No. 20 Civ. 6692 (CS), 2021 WL 4120676 (S.D.N.Y. Sept. 9, 2021); *1140 Broadway LLC v. Bold Food, LLC*, No. 652674/2020, 2020 WL 7137817 (N.Y. Sup. Ct. Dec. 3, 2020); *558 Seventh Ave. Corp. v. Times Square Photo Inc.*, 149 N.Y.S.3d 55, 56 (App. Div. 2021) (obligating a tenant to pay rent even though its business was "shuttered for a period as a result of pandemic-related executive orders"); *Arista Dev., LLC v. Clearmind Holdings, LLC*, 172 N.Y.S.3d 271, 276 (App. Div. 2022) (rejecting the frustration of purpose defense as a matter of law due to the COVID-19 pandemic when the tenant had not been completely deprived of the benefit of its bargain).

Here, the Lease explicitly contemplates disruptions or delays to Dorian's use of the Premises that might be caused by government orders in responses to emergencies—rendering the restrictions not "unforeseeable." *NTS W. USA*, 2021 WL 4120676, at *5.

Additionally, the Lease provides that Dorian would use the Premises as a display room and for "general and administrative offices." Doc. 38-2 at ¶ 42(A). Even if Dorian could not open its display room to the public or utilize a curbside service model, Dorian could have used the Premises as a general or administrative office, or set up the Premises to create a virtual showroom—none of which were prohibited under the Executive Order. *Id.* The Lease also provided for a ten-year term, while the executive orders provided for a "temporary, albeit indeterminate" period of shutdown. *Williamsburg Climbing Gym Co., LLC v. Ronit Realty LLC*, No. 20 Civ. 2073, 2022 WL 43753, at *3 (E.D.N.Y. Jan. 5, 2022) (finding COVID-19 did not frustrate the purpose of a ten-year lease because the temporary restrictions imposed did not completely frustrate the Lease). As such, the pandemic was neither an entirely unforeseeable event, nor did it completely deprive Dorian of its benefit of the bargain such that the Lease's purpose was completely destroyed. *Id.* Thus, Defendants' counterclaim that the pandemic frustrated the purpose of the Lease is dismissed.

b. *Dorian's Failure to Perform the Owner's Work*

Separately, Defendants claim that A&R's failure to complete the Owner's Work frustrated the purpose of the Lease because it prevented Dorian from using the Premises as a display room. Doc. 45 at 25. This argument hinges on the presumption that the Owner's Work was required to be completed before Dorian could take possession of the Premises. However, as noted previously, the Lease Rider expressly provided that Dorian could take possession prior to the completion of the Owner's Work. Doc. 38-2 at ¶ 43(A). Additionally, the Lease provided for a ten-year term, and A&R's failure to complete the Owner's Work in the first four months did not so completely frustrate the purpose of the Lease so as to deprive Dorian of the benefit of the bargain such that the

Lease should be terminated.  *See Williamsburg Climbing*, 2022 WL 43753, at *3.  Thus, Defendants' counterclaim that A&R's failure to complete the Owner's Work frustrated the purpose of the Lease is dismissed.

2.  *Rescission Based on Impossibility of Performance*

Separate and apart from the pandemic, Defendants claim that A&R's failure to deliver keys and complete the Owner's Work made it impossible for Defendants to use the Premises for its intended purpose.  Doc. 45 at 27–28.

The impossibility defense is available when a contract becomes "objectively impossible" to perform.  *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987).  It is unavailable if "performance is possible, albeit unprofitable."  *Warner v. Kaplan*, 892 N.Y.S.2d 311, 314 (App. Div. 2009).  The Court does not find A&R's delivery of the keys to Dorian via a doorman sufficient to trigger the doctrine of impossibility, as nothing about having to go through a doorman to receive the keys made Dorian incapable of using the Premises.  Similarly, nothing related to the completion of the Owner's Work made it objectively impossible for Defendants to use the Premises.  Thus, the Court dismisses Defendants' counterclaim of rescission based on impossibility of performance.

3.  *Reformation of Lease and Guaranty*

Next, Defendants ask the Court to reform the Lease and Guaranty "to reflect the parties' true intent" and relieve Dorian of its obligation to pay rent once it was deprived of use of the Premises.  Doc. 9 at 14–15.  Defendants argue that at the time the Lease was executed, the parties understood that A&R was obligated to complete the Owner's Work before Dorian took possession of the Premises.  Doc. 45 at 28–29.  A&R counters that Defendants provide no basis for reformation because they have not offered any evidence of fraud, mutual mistake, or that the Lease or Guaranty misstates the parties' intentions.  Doc. 40 at 22–23; *see also Chimart Assocs. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986) ("The proponent of reformation must show in no uncertain terms, not only that mistake or

fraud exists, but exactly what was really agreed upon between the parties.") (internal quotations omitted).

The Court finds that reformation is not required on the facts of this case. Reformation requires Defendants to show that the "agreement is at variance with the intent of both parties." *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 385 N.E.2d 1062, 1066 (N.Y. 1978). "Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, [Defendants] cannot defeat summary judgment by a conclusory assertion that … the writing did not express [their] own understanding of the oral agreement reached during negotiations." *Chimart*, 489 N.E.2d at 232. That is precisely what Defendants seek to do here. Two sophisticated parties engaged in counseled negotiations regarding a commercial Lease. Doc. 46 at 6 ¶ 22; Yorgancioglu Tr. at 12:2–22. Those negotiations are memorialized in the Lease signed by both parties. Doc. 38-1 at 6. The parties did not impose a timetable or schedule for the completion of the Owner's Work in the Lease, the Lease Rider, or the Amendment. *See generally* Doc. 38-1; Doc. 38-2; Doc. 38-3. The Court declines to re-write those contracts to insert provisions that the parties failed to include themselves.

### 4. *Return of Security Deposit*

Neither party addressed Defendants' fourth counterclaim regarding the return of its security deposit in their briefs. *See generally* Doc. 40; Doc. 45; Doc. 49. Federal courts deem a claim abandoned when one party moves for summary judgment and the party opposing summary judgment fails to address the argument. *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015). Here, A&R's motion for summary judgment sought dismissal of all Defendants' counterclaims. As Defendants failed to address the return of its security deposit in its opposition, the Court considers the counterclaim abandoned. Thus, the Court grants A&R's motion for summary judgment seeking the dismissal of this counterclaim.

## IV.     CONCLUSION

For the reasons set forth above, A&R's motion for partial summary judgment is GRANTED.  The parties are directed to appear for a conference on November 1, 2023 10:30 a.m.  The parties are directed to dial 877-411-9748 and enter access code 3029857# when prompted.  The Clerk of Court is respectfully directed to terminate the motion. Doc. 37.


It is SO ORDERED.

Dated:     September 26, 2023
           New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.